IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DENISE SCHAFFER | CIVIL ACTION |
|---|---|
| v. | NO. 24-5598 |
| PENN ENGINEERING & MANUFACTURING, CORP. | |

**March 9, 2026**                                                    **Michael M. Baylson, J.**

<u>MEMORANDUM</u>

Plaintiff Denise Schaffer worked on the production floor at Penn Engineering &
Manufacturing Corp. ("Penn Engineering") as a machine operator in the manufacture of metal
fasteners.  After the company terminated her employment in March 2024 during a reduction in
force, she brought this lawsuit claiming violations of the Americans with Disabilities Act
("ADA"), the Family and Medical Leave Act ("FMLA"), the Age Discrimination in
Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA").[1]  Penn
Engineering moves for summary judgment (ECF No. 16), and for the reasons stated below, I will
grant the motion in part.

I.    **BACKGROUND**

   A.    **Employment history**

Schaffer is a high school graduate with a work history in machine operation in
manufacturing plants.  She worked for Penn Engineering for almost ten years before stepping
away for childcare responsibilities and later re-applied in December 2022.  Penn Engineering re-
hired her at that time into the position of Auto Tapping Operator ("Auto Tapper").  This is an

---

[1] I exercise jurisdiction under 28 U.S.C. §§ 1331 and 1367.

1

unskilled job and, among the three operator positions in Penn Engineering's "tapping operations," the position requiring the lowest skillset.  She reported to Shawn Riley.

In January 2023, shortly after returning to Penn Engineering, Schaffer sustained a workplace injury that limited her to work in a "light duty" capacity for approximately two months.  At the recommendation of her orthopedist, she then took a short-term disability leave from May 5, 2023 to July 10, 2023.

### B.    Attendance and performance issues

Following her return to work, Schaffer called out on several occasions without sufficient vacation or sick time to cover her absence, rendering it unexcused.  This occurred on August 8, August 29, September 6, and September 14, 2023.  She also left early, again unexcused, on August 30, 2023.  ECF No. 16-6 at 101.  This attendance record resulted in a verbal warning, a written warning, and finally a 3-day suspension.  *Id.*  On January 8, 2024, Schaffer received a verbal warning after a co-worker reported that she was complaining about her job assignment.  Def.'s Statement of Undisputed Material Facts, ECF No. 16-3 ("Def.'s SUMF") ¶ 63; Shaffer Dep. Ex. 19.  She also continued to have unexcused tardies in the new calendar year and was issued a verbal warning for that on February 14, 2024.  Def.'s SUMF ¶ 65; Shaffer Dep. Ex. 20.

### C.    FMLA leave request

On February 15, 2024, Schaffer asked Riley about taking FMLA leave to care for her mother, whose chronic illness had been the reason for some of her attendance infractions.  He directed her to the HR Operations Specialist, who promptly provided her the necessary forms.  Upon receipt for the necessary certification from Schaffer's mother's doctor, Penn Engineering approved Schaffer on February 29, 2024 to take intermittent FMLA leave.  The request, and the approval, reflected that Schaffer was needed to provide "transportation" to her mother's medical

appointments, which were expected to occur every two months. The first such appointment was scheduled for March 26, 2024 and would involve a lab appointment two weeks prior. ECF No. 17-19; ECF No. 16-6 at Ex. 22.

### D.    RIF and termination

Plant Manager Jason Hertz detected "signs of slowing" in the business in 2023. This led to discussions that continued into early 2024 about what changes might need to be made apart from trying to control costs. As the company faced a "particular slowness" in late February and into early March 2024, Hertz and other company leaders considered a reduction in force. On March 8, 2024, Hertz shared with company leaders his proposal for a reorganization, contained in a Power Point presentation. He proposed Schaffer's position, and the positions of five other employees at the plant (none of whom were Auto Tappers), for elimination. He noted that Penn Engineering had paused hiring on three open positions and offered early retirement packages to two employees with upcoming planned retirement dates. Def.'s SUMF ¶¶ 94-95; Hertz Dep., Def.'s Ex. D, at 31-37 & Ex. 2.

Penn Engineering implemented this reduction in force on March 27, 2024. Hertz, accompanied by a Human Resources employee, met with Schaffer on that date. Schaffer was upset. As Riley escorted her out of the plant, he remarked: "Well, now you can take care of your mom. You have all the time now that you can take care of your mom and get paid." Schaffer Dep., ECF No. 17-2, at 166.

Schaffer was 54 years old at the time of her termination.

## II.    PROCEDURAL BACKGROUND

After filing an administrative charge with the EEOC and receiving notice of her right to sue, Schaffer brought this lawsuit on October 22, 2024. She amended her complaint on May 21,

3

2025 to reflect the conclusion of the state administrative process.

Count I of her amended complaint asserted four types of violation of the ADA based on Schaffer's health condition or protected activity, but she subsequently withdrew that count in its entirety.[2]  Count II asserts a different claim under the ADA, for associational disability discrimination, relating to the alleged disability of her mother, due to which Schaffer took time off from work.  Count III asserts violations of the FMLA in the form of interference with anticipated future use of FMLA leave and retaliation for having requested FMLA accommodations.  Count IV asserts that her termination reflected age discrimination in violation of the ADEA.  Counts V asserts violations of the PHRA for associational disability (as set out in Count II) and for age (as set out in Count IV).  Am. Compl., ECF No. 14.

On June 18, 2025, Penn Engineering moved for summary judgment, supported by a memorandum of law and Statement of Undisputed Material Facts.  Def.'s Mot. Summ. J., ECF Nos. 16, 16-1; Def.'s SUMF, ECF No. 16-3.  Plaintiff responded on July 9, 2025 with a memorandum of law, a response to Defendant's statement of facts, and her own account of facts.  Pl.'s Opp., ECF No. 17; Pl.'s Resp., ECF No. 17-44; Pl.'s SDMF, ECF No. 17-1.  Penn Engineering filed a reply and responded to Plaintiff's statement of facts on July 21, 2025.  Def.'s Reply, ECF No. 18; Def.'s Resp. to Pl.'s SDMF, ECF No. 18-1.

### III.   LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."

---

[2]  *See* Pl. Oppos. to MSJ, ECF No. 17, at 1 n.1 (withdrawing Count I and other claims of hostile work environment in response to Defendant's summary judgment motion).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where, as here, the moving party does not have the burden of proof on the relevant issues, the court "must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law."  *Anchorage Assocs. v. Virgin Islands Bd. of Tax Revenue*, 922 F.2d 168, 175 (3d Cir. 1990) (citing *Celotex Corp.*, 477 U.S. 317).  If the facts alleged by the movant are not disputed, the Court *may* grant summary judgment "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

In ruling on a motion for summary judgment, the Court must draw all inferences from the facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions."  *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

## IV.    DISCUSSION

Penn Engineering asserts that Schaffer's claims fail because her termination was due to operational needs and performance or attendance issues unrelated to her use of FMLA leave, her

association with a disabled person, or her age.  I will first address the claims asserted under the FMLA and then proceed to the discrimination claims that allege violations of federal and state law.[3]

### A.    FMLA Claims

The FMLA permits eligible employees to take up to 12 workweeks of leave during any 12-month period to provide care to a family member with a serious health condition.  29 U.S.C. § 2612(a)(1).  In Count III of her complaint, Schaffer asserts that Penn Engineering violated her rights under the FMLA in two respects when it terminated her at a time her mother required Schaffer's assistance with certain aspects of her serious health condition.

### 1.    FMLA Interference

As part of its protections for employees entitled to leave, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  A plaintiff establishes actionable interference with the exercise of FMLA rights where: (1) the employee was an eligible employee under the FMLA; (2) the employer is a covered employer; (3) the employee was entitled to FMLA leave; (4) the employee expressed an intention to take FMLA leave; and (5) the employer denied leave to which the employee was entitled, *i.e.*, the FMLA benefits "were actually withheld."  *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

---

[3]    Schaffer brings a claim under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963, alleging discrimination on the basis of disability association as well as her age.  Am Compl. Count V & ¶ 77, ECF No. 14 (referencing claims set forth in Count II (ADA association) and IV (ADEA)).  Disability discrimination and age discrimination claims under the PHRA are evaluated under the same standards as claims under the ADA and ADEA.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (approving analysis of PHRA claims as co-extensive with ADA and ADEA claims); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1998).  Therefore, my analysis of the ADA and ADEA claims will serve as my analysis of the corresponding PHRA claim in Count V.

Penn Engineering contends that Schaffer does not make out an actionable claim of interference because it approved her request for intermittent leave – she was not denied anything to which she was entitled.  But the Third Circuit has recognized that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) (allowing employee alleging a discharge in violation of the FMLA to proceed under both the interference and retaliation theories of recovery).  Thus, her termination prior to taking the upcoming approved intermittent leave can satisfy the requirements for a claim of FMLA interference.  Summary judgment will be denied on the FMLA interference claim.

### 2.      FMLA Retaliation

Schaffer also alleges that her termination was an act of retaliation against her because she invoked her FMLA rights.  Unlike the FMLA interference claim, an FMLA retaliation claim requires proof of the employer's retaliatory intent, as in Title VII claims.  *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012).  Where, as here, the retaliation claim is based not on direct but on circumstantial evidence, it is assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Lichtenstein*, 691 F.3d at 302.  Under this framework, Schaffer must first establish a *prima facie* case of retaliation.  If she does so, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If Penn Engineering is able to do so, the burden then shifts back to Schaffer to prove, by a preponderance of the evidence, that the articulated reason was pretext for the retaliation.

### a.  Prima Facie Case

To establish the *prima facie* case for FMLA retaliation, Schaffer must show that (1) she invoked her right to FMLA leave; (2) she suffered an adverse employment action; and (3) the

7

adverse employment decision was causally related to the exercise of her FMLA rights. *Ross*, 755 F.3d at 193. Factors relevant to establishing the causal link between the adverse employment decision and the FMLA leave include a showing that the two events were close in time or evidence of ongoing antagonism toward the employee. *See Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir.2001). The Third Circuit cautions that "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004). But at the same time, it has allowed even a span of three months between the protected activity and the adverse employment action to provide a basis from which an inference of retaliation can be drawn. *See Fasold v. Justice*, 409 F.3d 178, 189-90 (3d Cir. 2005)

Penn Engineering asserts that Schaffer fails to establish a *prima facie* case of retaliation because she cannot demonstrate that her February 15, 2024 request to take intermittent FMLA leave — a protected activity — is causally connected to her termination, which was effectuated on March 27, 2024 in the RIF. But the timeline of her request to take FMLA leave (on February 15, 2024), her inclusion on the intended RIF list (on March 8, 2024), and the effectuation of her termination (on March 27, 2024) is not outside the range in which courts have permitted cases to be considered by a jury. The timeline satisfies the causal connection element of the *prima facie* case.

### b. Response to legitimate, non-discriminatory reason

Penn Engineering responds that its termination decision was legitimate and non-discriminatory. It contends that its decision was justified by the need to trim positions that were not fully utilized and involved the lowest skillset. Within the Auto Tapper cohort, the selection of Schaffer's position for elimination was justified by her history of attendance violations and the

impact on morale on the production floor of her negative attitude.  It notes that Hertz foresaw, as early as the fall of 2023 as he began the budgeting process for the next calendar year, that Schaffer was not likely to remain employed at Penn Engineering.  It also notes that Hertz memorialized his intention to terminate Schaffer's employment in the upcoming RIF in a presentation he prepared on March 8, 2024 – prior to his being informed of her recent request to take intermittent FMLA leave.  This evidence meets its burden under the *McDonnell Douglas* analysis.

At this point, then, Schaffer "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### (1) **Implausibility of stated reason**

In her brief in opposition to summary judgment, Schaffer points to five circumstances that she believes undermines Penn Engineering's rationale: (1) Penn Engineering utilized subjective criteria in selecting her for the RIF; (2) it offered her an unsolicited severance agreement; (3) it terminated her less than a month after she was approved for FMLA leave; (4) it retained significantly younger, less qualified, and less experienced individuals; and (5) it provided inconsistent statements surrounding Schaffer's termination.  Pl. Opp. at 25-35.  In relation to this claim of FMLA retaliation, all but factor (4) are relevant to her claim of pretext.  Yet no reasonable jury would find that these contentions are supported by the record or that they, in fact, undermine Penn Engineering's position.

First, Schaffer has not undermined Penn Engineering's contention that it experienced a

9

downtown in business in 2023 and began discussing cost-saving measures, including a reduction in force to reduce those costs and align business needs. She has not undermined the company's explanation that her position as an Auto Tapping Operator was the least skilled, that she had been disciplined for attendance issues, and that there were complaints about her behavior on the shop floor. She faults Penn Engineering for not having created "contemporaneous internal documents" about including her in the RIF and rating or ranking data for the Auto Tappers. Pl. Opp. at 28, 30. She suggests that Penn Engineering selected her based on "purely subjective" notions about her "fit" and her "performance." *Id.* at 30. But the record documents her attendance issues – a type of poor performance – as well a concern brought to management by a co-worker about the effect on the production floor of Schaffer's complaints. Thus, Schaffer's claims that the RIF process lacked an objective basis ring hollow.

Next, Schaffer points to Penn Engineering's offer to her of a severance agreement. She notes that an unsolicited offer of severance pay contingent upon a release of claims may be admissible at trial, and that such an offer when not warranted by an explicit company policy can be evidence of pretext. Pl. Opp. at 32. But the record does not support that she was the only individual offered a severance agreement in the March 2024 RIF. Rather, the agreement offered to her suggested that severance was being offered to employees separating due to the RIF. Therefore, the fact that Penn Engineering offered her a severance package with release does not undermine the legitimacy of its explanation for terminating her.

Third, Schaffer contends that the timing of her termination establishes pretext, insofar as her termination followed less than a month after she was approved for intermittent FMLA leave and just 16 days after Hertz, the plant manager, was notified of her leave approval. While the timing of her termination in relation to her protected activity enabled her to satisfy the *prima*

10

*facie* requirement as set forth above, nothing about the fact of her invocation of her FMLA rights undermines the explanation given for her termination. The record as a whole contradicts any suggestion that the RIF was used to rid Penn Engineering of employees who exercised their FMLA rights. *See also* Def. SUMF ¶ 110; Hertz Decl., ECF No. 16-5, at ¶ 11 & Ex. I (attesting that 15 other employees were approved for intermittent FMLA leave as of March 11, 2024, including other Auto Tappers; only Schaffer's position was eliminated in the RIF).

Finally, Schaffer contends that her claim of pretext is supported by the supposed inconsistencies in Penn Engineering's articulation of the reason for her termination. She compares interrogatory answers verified by Grayson Holladay, the HR representative, with the deposition testimony of Hertz as to the reasons she was terminated. But they are not materially different. Holladay cited future business needs; Hertz noted that her lower skillset could be absorbed by more skilled personnel. Holladay cited Schaffer's performance and Hertz noted her low production numbers and the fact that she "caused problems" on the production floor from a "cultural standpoint." Both cited her attendance. The record does not reflect shifting explanations as might point to pretext, either in the explanations given or the timeline in which that decision was reached.

Schaffer's arguments as to pretext do not sustain her burden to undermine the legitimacy of Penn Engineering's non-discriminatory (and non-retaliatory) explanation for terminating her position.

### (2) **Discriminatory reason a motivating or determinative factor**

Alternatively, Schaffer can avoid summary judgment on her FMLA retaliation claim if she can point to other evidence, even circumstantial, from which a jury could reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative

11

factor of the termination. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). In this claim, that evidence would need to point to a desire to retaliate against Schaffer for having invoked her FMLA rights when she sought intermittent leave to transport her mother to her medical appointments.

Schaffer points to two circumstances as evidence of unlawful intent. The first is what she considers "the unusually suggestive timing" of her termination in relation to her request to take intermittent FMLA leave. She notes that on February 29, 2024 Penn Engineering received the paperwork from her mother's healthcare provider to support her request to take intermittent leave as needed for her mother's appointments, the first of which was to be March 26, 2024; that Penn Engineering communicated to her the approval of her FMLA request on March 8, 2024; and that it then terminated her employment on March 27, 2024. She also points to Riley's comment to her that her termination would give her the time to care for her mother – reflecting his awareness that she would have been utilizing FMLA leave in the future – and suggests that his comment reflects that an invidious reason was a motivating or determinative factor in the company's decision to terminate her. She argues that this evidence, in combination, would permit a reasonable jury to conclude that she was terminated because she had invoked her right to take FMLA leave. Pl. Br. in Opp. to MSJ at 13-14.

This evidence is not sufficient to establish that Penn Engineering's intention to retaliate against Schaffer was more likely than not a motivating or determinative factor in her termination. When viewed in the totality of the circumstances, no reasonable jury would find that Schaffer's intention to take intermittent leave – in 6-hour increments, on a few occasions every few months – was the determinative factor in her selection as the Auto Tapper who would be let go in the RIF. As discussed further below in the context of her ADEA claim, as between the other Auto

Tappers employed in early 2024, Schaffer's attendance issues and productivity rating rendered her the most obvious choice for a reduction designed to maximize productivity and flexibility for assigning employees to work various pieces of equipment.  And while the record demonstrates that Riley, Schaffer's supervisor, was aware of her need to care for her mother, there is no evidence that he shared this circumstance with Hertz as Hertz considered reductions to the production floor.

The record lacks evidence from which a jury could conclude that Schaffer's invocation of an FMLA right motivated Penn Engineering to retaliate against her.  She has not sufficiently rebutted Penn Engineering's evidence that it terminated her for reasons other than to retaliate against her for asserting her right to time off to attend to her mother's care.  Penn Engineering is entitled to summary judgment on the FMLA retaliation claim.

### B.    ADA Associational Disability Claim

In Count II, Schaffer asserts a claim under the ADA based not on an allegation that *she* is an individual with a disability (as she initially did in Count I of her Amended Complaint) but rather based on her "association" with such a person: her mother.

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  Citing published opinions of other courts of appeal, the Third Circuit has accepted that a plaintiff employee establishes a *prima facie* case of associational disability if:

> (1) the plaintiff was "qualified" for the job at the time of the adverse employment action; (2) the plaintiff was subjected to an adverse employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; [and] (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of

the relative or associate was a determining factor in the employer's decision.

*Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 83 n.8 (3d Cir. 2019). The fourth element may be met if there is evidence that the employer was "motivated by unfounded stereotypes or assumptions about the [employee's] need to care for a disabled person" or because the employee was perceived to be distracted by the relative's disability. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 & n.7 (3d Cir. 2009). Courts have noted the distinction between firing an employee "because of a relative's disability" and firing an employee "because of the need to take time off to care for a relative," e.g., the employee's absenteeism and inability to attend work. *See, e.g., Tucker v. Concrete*, No. 22-1026, 2024 WL 1485992, *11 (D.N.J. Apr. 5, 2024) (citing *Erdman*).

The court in *Erdman* made several observations that are relevant here. First, "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Erdman*, 582 F.3d at 510. The employee must establish that the employer terminated her because of the relative's *disability* – which is not the same thing as firing the employee because of the need to take time off to care or the relative. *Id.* The court continued:

> The statute clearly refers to adverse employment actions motivated by "the known disability of an individual" with whom an employee associates, as opposed to actions occasioned by the association. Therefore, [the plaintiff] must show that [her employer] was motivated by [her child's] disability rather than by [the employee's] stated intention to miss work; in other words, that she would not have been fired if she had requested time off for a different reason.

*Id.* (footnote omitted). *See also Beird v. Lincoln Univ. of the Commonwealth Sys. of Higher Educ.*, 487 F. Supp.3d 270, 282 (E.D. Pa. 2020) (observing that if the employer was singling employee out "for her time off, rather than for her or her family members' disabilities, the proper claim is one for FMLA retaliation, not associational disability discrimination.").

Penn Engineering contends that Schaffer lacks evidence of discriminatory animus

14

regarding her mother's alleged disability.  She testified that after she disclosed to Riley, her supervisor, that she would need to take intermittent FMLA leave due to her mother's needs, he asked her how much time she thought she would be taking off and if she thought she'd be able to do her job.  Schaffer Dep., ECF No. 16-6, at 185.  Following her termination, he also commented that one upside of her termination was that now she would have time to care for her mother, and he thought she could perhaps secure government funding for that care.  But Penn Engineering contends that this evidence does not establish discriminatory animus, i.e., that it terminated her because of her mother's disability.  *See also id.* (Schaffer's deposition testimony that she never discussed her mother's health with Hertz, whom she saw "twice out of my whole time being employed").

Schaffer counters that she can meet the fourth element where Penn Engineering perceived her to be "distracted by" her relative's disability.  She notes that the Second Circuit permits an associational claim to proceed if the employee establishes that the determining factor behind an adverse employment action was the employer's concerns that the employee would be inattentive at work due to the disability of her relative.  Schaffer argues that Riley's comment following her termination showed that he perceived her mother to require full-time care.  In Schaffer's view, this reflected "unfounded stereotypes of assumptions about the care disabled people require" and that Riley refrained from opposing Hertz's proposal to terminate Schaffer in the RIF "likely due to his discriminatory perceptions of Ms. Schaffer's association with her disabled mother."  Pl. Opp. at 24.

But the "distraction theory" Schaffer posits here does not square with the facts.  There is no evidence that there was a problem with her being "distracted" from her work.  Rather, her unskilled position most importantly required her to be *present* for work as scheduled.  Any

15

comments by Penn Engineering management about her mother's condition was always in relation to it causing Schaffer to be absent from work. There is no evidence that Schaffer's mother's "disability," which is not even identified in the record, was the subject of any particular interest to Penn Engineering, nor that it triggered any animosity in management. No jury could reasonably find from this record that "a determining factor" in the company's decision to terminate Schaffer was her mother's disability. Penn Engineering is entitled to summary judgment on the associational disability claim under the ADA and the PHRA.

### C.    ADEA Claim

The final federal claim that Plaintiff pleads, in Count IV, asserts age discrimination.

The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA analysis proceeds according to a "slightly modified" version of the *McDonnell Douglas* burden-shifting framework utilized in other federal causes of action supported only by circumstantial evidence of discrimination.[4] *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). The elements of a prima facie case of age discrimination are: (1) the plaintiff is at least forty years old; (2) she suffered an adverse employment decision; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Id.* Where the plaintiff is not directly replaced, the fourth element is satisfied if she provides facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible

---

[4] Schaffer does not point to any direct evidence of age discrimination. She testified in her deposition that she is unaware of any age-related comments ever made about her by Hertz (the plant manager), Riley (her supervisor), or anyone else – nor about anyone else. Def.'s SUMF ¶ 109 (admitted).

factors." *Id.* (quotation omitted).  But in the context of "a reduction in force situation," our Court of Appeals has made clear that "the plaintiff must show, as part of the fourth element [of the prima facie case], that the employer retained someone similarly situated to him who was sufficiently younger."  *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 250 (3d Cir. 2002).

Schaffer was over 40 years old and was terminated from a position for which she was qualified, so she satisfies prongs 1, 2, and 3.  She contends that she can meet the fourth element of the *prima facie* case because Penn Engineering retained three people substantially younger than herself – Arezki Abbane, Abu Mollick, and Shannon Diehl – who were similarly situated to her in terms of working in the same area and in approximately the same position.  Pl. Opp. at 15-16.  Penn Engineering does not dispute that these individuals are younger than Schaffer and were not selected for termination in the RIF.  But it responds that they are not proper comparators and thus do not serve to support her prima facie case.

<u>Arezki Abbane</u>

Penn Engineering hired Arezki Abbane on January 5, 2024.  Like Schaffer, he reported to Riley.  Schaffer notes that Penn Engineering identified certain performance issues in his subsequent annual review, for which it gave him constructive feedback, but it did not select him for the March 2024 RIF.  Abbane is approximately 10 years younger than Schaffer.

Penn Engineering argues that Abbane is not a proper comparator because, among other reasons, he served in a different position.  It cites to performance evaluations prepared in March 2024 and February 2025 that identify his position as "Cold Forming/Cell Operator," which involves a higher skill level to operate a different machine.  But Schaffer has pointed to the offer letter that Penn Engineering extended to Abbane from January 2024 which describes his position as "Tapping Operator, Second Shift," not Cold Forming/Cell Operator.  Pl.'s Ex. 25.  Therefore,

17

Abbane may well constitute an appropriate comparator for Schaffer, whose position was "Auto Tapping Operator." In light of the identification of Abbane as a significantly younger comparable employee who was retained in the RIF, Penn Engineering cannot obtain summary judgment at the *prima facie* stage.

In the face of Penn Engineering's statement of a legitimate, non-discriminatory reason for her termination, however, Schaffer still must carry her ultimate burden of persuasion that Penn Engineering discriminated against her on the basis of age when it terminated her – that is, that her age was the "but for" cause of her selection in the RIF. As with her FMLA retaliation claim, she asserts that she can do this by establishing pretext, that is, demonstrating the implausibility in Penn Engineering's stated non-discriminatory reason for terminating her: that a reduction in force was necessary and her performance and attendance issues justified selecting her as the Auto Tapper position to be eliminated.

The discussion above in the context of the FMLA retaliation claim addresses most of the pretext arguments that Schaffer articulates in opposition to Penn Engineering's summary judgment motion. Schaffer also contends that the retention of significantly younger, less qualified, less experienced individuals is evidence of pretext. In addition to the retention of Abbane, she points to Penn Engineering's retention of other employees from the production floor as evidence of age discrimination.

Abu Mollick

Schaffer points to the retention of Abu Mollick over her in the RIF as indicative of age discrimination. Mollick is eight years younger than Schaffer. She notes that Mollick received a verbal warning for "substandard work performance," which was documented in a June 26, 2023 Corrective Action. Schaffer did not receive a Corrective Action for substandard work

performance during her tenue.  But the record reflects that she did receive a verbal warning in January 2024, which was documented and reflected she was complaining on the production floor about her work assignments.  And the record of her attendance violations was well documented and resulted in a suspension.  Therefore, the retention of Mollick over Schaffer in the RIF does not support her claim of age discrimination.

Shannon Diehl

Schaffer also points to the retention of Shannon Diehl as evidence that she was selected for termination in the RIF because of her age.  Diehl is approximately 27 years younger than Schaffer.  Schaffer notes that Diehl fell asleep on the job but was given only the "lenient discipline" of a verbal warning.

This comparison does not aid Schaffer in showing discrimination in the March 29, 2024 RIF.  Diehl had not incurred any disciplinary infractions at the time Schaffer was selected over her for the RIF.  Rather, the incident to which Schaffer refers occurred on June 20, 2024, and Penn Engineering issued Diehl a warning.  Pl.'s SDMF ¶¶ 90-93.  The uncontested record also reflects that around this time Diehl began to have transportation issues getting to work and developed attendance problems – which she did not have in March 2024.  Penn Engineering terminated her employment during the summer of 2024 because of those attendance problems.  Pl.'s Ex. 5, Holloday Dep. at 88-89.  The retention of Diehl at the time of the March 27, 2024 RIF implementation thus does not support Schaffer's claim of age discrimination.

Jagrutiben "Ruti" Patel

Schaffer next points to the retention of Jagrutiben Patel as evidence that Penn Engineering's rationale for her termination in the RIF is clouded in pretext.

It is uncontested that Patel also worked as an Auto Tapping Operator under Riley's

supervision. Penn Engineering's performance evaluation of Patel dated March 15, 2024 documented that she has periods where she "accumulates tardies" and "comes close" to earning a write-up for it, but she was rated as "meets expectations" regarding attendance because "she didn't have any write-ups this year." The performance evaluation reiterated a "goal" for the coming year: to remain in her work area more consistently, maintaining her focus on her specific jobs and not worrying about other people, as Patel "tends to be a social butterfly and distracts others from doing their job." The evaluation concluded that "overall," she did her job well and was efficient, and cited high efficiency numbers. Pl.'s Ex. 34.

Schaffer contends that she, by contrast, "had no documented discipline for attendance." Pl. Oppos. at 33-34. But the record does *not* support the proposition that Patel had "documented discipline for attendance," and Schaffer had a sufficiently egregious recent history of attendance violations that she earned a suspension because of it in September 2023. While that slate was wiped clean in terms of the progressive discipline model with the new calendar year, that did not erase the fact that Schaffer had a significant recent "attendance issue." And she had already incurred another attendance violation in February 2024. As to the question of performance, Penn Engineering responds with evidence that Patel was a better performer – with a much higher efficiency quotient and "superior" ratings in her March 2024 performance review. Pl.'s Ex. 35. Thus, the retention of Patel over Schaffer does not support Schaffer's contention that Penn Engineering's rationale for her termination was pretextual.[5]

---

[5] Schaffer's introduction to the role of Patel misrepresents Patel's age relative to her own. *See* Pl. Oppos. Br. at 33 (section heading asserting that "Defendant Retained Significantly Younger, Less Qualified, Less Experience [sic] Individuals Over Ms. Schaffer"). Penn Engineering's answers to Plaintiff's interrogatories identified Patel as age 58, which would be a few years *older* than Schaffer. Pl.'s Ex. 8 at ¶ 18. *See also* Def.'s SUMF ¶ 107 (describing Patel as 57 years old at the time of the RIF). The retention of Patel thus *undermines* the notion that but for Schaffer's age, she would not have been selected for termination in the RIF.

MD T. Islam

The final other employee whose retention Schaffer finds significant for purposes of pretext is MD T. Islam.  Schaffer contends that he received a documented verbal warning for "substandard performance" in June 2023, while Schaffer asserts that she had "no documented history of substandard performance."  Pl. Oppos. at 34.  But Penn Engineering responds that Islam held a different position than Schaffer.  While she was an Auto Tapper, which reflected that she had the lowest skillset, he was a "Cold Forming / Cell Operator," with a broader skillset.  "Cold Forming / Cell Operators" were capable of running cold forming machines *as well* as tapping machines.  Def. SUMF ¶¶ 8, 10.  Thus, the retention of Islam in a RIF meant to reduce excess capacity does not help Schaffer establish pretext.

Schaffer's efforts to point to pretext in Defendant's rationale for her selection in the RIF come up short.  Nor does the record support her insistence that, notwithstanding the legitimacy of the stated reason for her selection in the RIF, her age was a motivating factor.  As noted above, Penn Engineering retained Patel, who was a few years older than Schaffer.  It also retained another Auto Tapper of similar age, Vinh Khuu, who was just two years younger.  Def.'s SUMF ¶ 107.  This record does not provide sufficient evidence from which a reasonable jury would find that Schaffer's age was a determinative factor in Penn Engineering's decision – that is, if not for her age, she would not have been terminated.  Penn Engineering is entitled to summary judgment on the age discrimination claim under the ADEA and the PHRA.

## V.    CONCLUSION

For the reasons discussed above, I will grant Defendant's Motion for Summary Judgment as to Schaffer's ADA associational disability claim, ADEA claim, the parallel PHRA claim, and the FMLA retaliation claim.  Plaintiff has withdrawn her other ADA claim asserted in Count I and

any other claims of hostile work environment.  Summary judgment will be denied on her FMLA

interference claim.  An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 24\24-5598 Schaffer v Penn Engineering\24cv5598 memorandum on MSJ.docx